Filed 4/6/26  P. v. Tobias CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B341475 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA474808) |
| v. | |
| ART TOBIAS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Eleanor J. Hunter, Judge.  Affirmed.

Janyce Keiko Imata Blair under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

Shortly after midnight on July 5, 2018, appellant Art Tobias, William Vasquez, and Gerardo Lalo Fajardo, Jr. fired at least 39 shots into a Fourth of July gathering at which they believed rival gang members were present. Four people, including an unborn fetus, were killed, and three others were injured. After a joint jury trial,[1] appellant was convicted of four counts of first degree murder, three counts of attempted murder, and personal use firearm enhancements. The trial court sentenced him to an aggregate term of 142 years to life and imposed restitution and parole revocation fines and various fees.

Appellant raises three arguments on appeal. First, he contends his convictions must be reversed due to the improper admission of jailhouse statements he made to an undercover agent. (See *Illinois v. Perkins* (1990) 496 U.S. 292 (*Perkins*).) Second, he contends insufficient evidence supported the finding that he personally used a firearm during the crimes. Finally, he contends the fines and fees must be vacated because the trial court imposed them without considering his ability to pay. We reject these contentions and affirm.

## PROCEDURAL HISTORY

An information filed September 8, 2022 charged appellant, Vasquez, and Fajardo with the July 5, 2018 first degree murders of Abril Onofre (count 3), Baby Jay Salinas Onofre (count 4), James Salinas (count 5), and Ruben Alcantara (count 6). (Pen. Code, § 187, subd. (a).)[2] It also charged all three codefendants with the July 5, 2018 willful, deliberate, and premeditated

---

[1] Vasquez and Fajardo were also charged with and tried for a second fatal gang-related shooting.
[2] All further statutory references are to the Penal Code unless otherwise indicated.

2

attempted murders of C.Z. (count 7), R.M. (count 8), and M.L. (count 9).[3] (§§ 187, subd. (a), 664.) The information alleged that each codefendant personally used a handgun during the July 5, 2018 offenses. (§ 12022.5, subds. (a), (d)).[4]

The jury found appellant, Vasquez, and Fajardo guilty on all counts and found all the enhancement allegations true. The court sentenced appellant to an effective aggregate term of 142 years to life, as follows: consecutive terms of 25 years to life plus the low term of three years for the firearm enhancement on each of counts 3, 4, 5, and 6, plus consecutive terms of life plus the low term of three years for the firearm enhancements on counts 7, 8, and 9.

Appellant timely appealed.

## FACTUAL BACKGROUND

### I. Prosecution Evidence

#### A. Diablos Gang

Steve Shim testified pursuant to an immunity and plea agreement, under which he agreed to plead guilty or no contest to one count of murder (§ 187, subd. (a)) and one count of accessory

---

[3] The information refers to the attempted murder victims by their initials. We also refer to them by their initials to protect their privacy. (See Cal. Rules of Court, rule 8.90(b)(4).)

[4] The information also included great bodily injury enhancement allegations on counts 7, 8, and 9 (§ 12022.7, subd. (a)), and numerous aggravating factors as to all counts (Cal. Rules of Court, rule 4.421(a)). The People dismissed the great bodily injury allegations, and elected not to proceed on the aggravating factors. Count 1 of the information charged Vasquez and Fajardo with the October 7, 2018 murder of Jerry Ramos (§ 187, subd. (a)), and count 2 of the information charged another individual with accessory after the fact (§ 32). The latter individual was not tried with appellant, Vasquez, and Fajardo.

3

after the fact (§ 32, subd. (a)), with dismissal of the murder charge at sentencing in exchange for truthful testimony. Shim, who suffered a felony conviction in 2007, testified that he met Vasquez at work around 2016 or 2017. Shim became friends with Vasquez and was soon socializing with him outside of work almost every weekend.

After a few months, Shim learned that Vasquez belonged to and was in charge of the Diablos gang, also called DIA; Vasquez's nickname was "Chucky." Shim met other Diablos members through work and Vasquez, including appellant, who went by "Casper"; Fajardo, who went by "Shy Boy"; Mario Ruiz, who went by "Pin"; Jason Alfonso, who went by "Tear Drop"; and Vasquez's brother, Jonathan Vasquez, who went by "Forest."[5] Because Shim "liked the lifestyle" of DIA—"the money, just running around, not giving a shit about anything"—he got a gang tattoo and joined in April 2017. Shim's nickname was "Happy." Like Shim, other Diablos had various gang-related tattoos; appellant had devil horns near his temples and "Faketeen" on his jawline. Shim described appellant as "very skinny," with a shaved head.

Shim sold drugs and guns for the gang. He gave a percentage of his revenue to Vasquez, who used it for gang expenses, including purchasing guns. Shim testified that he personally carried a nine-millimeter Glock 17, and Vasquez regularly carried a .40-caliber Glock 22. Members who did not own their own weapons used "hood guns," communal guns owned by the gang and overseen by Vasquez.

In 2017, DIA's enemies included the 18th Street and Rockwood gangs. They referred to these enemies using derogatory terms, such as "Faketeen" for 18th Street and

---

[5] We refer to Jonathan by his first name to avoid confusion.

4

"Cockwood" for Rockwood. Shim testified that he and other DIA members entered Rockwood territory to spray paint graffiti and "go hunting" for Rockwood members to shoot at. When Diablos went "hunting," they typically took three cars: a "shooter car," a "lookout," and "a car that would circle around to make sure there was no cops." Vasquez selected the roles for each car, and provided the members with walkie-talkies; Shim explained the walkie-talkies made it "easier to communicate" and left "no cell phone record." Cars associated with the gang included Shim's red Acura TSX; Ruiz's (Pin's) gold Acura Legend; Jonathan's white Toyota Corolla; and Vasquez's gold Dodge Neon.

**B. July 5, 2018 Incident**

**1. Diablos Travel to and Within Rockwood Territory**

Shim testified that on July 4, 2018, he attended a barbecue at Vasquez's parents' house. Several DIA members were present, including Vasquez, Fajardo, and Jonathan. Shim did not testify that appellant was there. Shim saw Vasquez carrying his .40-caliber Glock 22, and saw Jonathan carrying a nine-millimeter Glock 19. Around 11:00 p.m. or midnight, Vasquez told the others, "Let's go find the Cockwoods." Shim testified that the group got "wild up" and left the house. Shim wanted to go but was too intoxicated from alcohol and cocaine to drive, so he went to sleep in his car instead.

Cell phone data were consistent with Vasquez and Jonathan being near their parents' home between 9:30 and 11:00 p.m. on July 4, 2018. Vasquez's phone was near victim C.Z.'s home between 12:00 and 12:20 a.m. on July 5, 2018, and Ruiz's was there minutes earlier. Appellant's phone had also been near C.Z.'s home earlier in the evening of July 4, between 9:30 and

5

9:50 p.m., before traveling to the area of his home. The cell phone data also showed that the Diablos' phones exchanged calls of varying duration with one another. Appellant called Vasquez at 11:24 p.m. on July 4, Vasquez called Ruiz at 11:44 p.m., and Ruiz called Vasquez at 12:19 a.m. on July 5. Vasquez's phone was also patched into a three-way call involving Jonathan's and Ruiz's phones around midnight.

Several different surveillance cameras in the area captured video of Ruiz's gold Acura driving around. Surveillance footage also showed two sedans, one white and one dark-colored, driving together in the area. The Acura was with them at some points. Video also showed three people in light-colored clothing exit the Acura and appear to tag a dumpster. Police later found the words "Casper" and "Pin" spray-painted on the dumpster; those names were associated with appellant and Ruiz.[6]

### 2. The Neighborhood and House

Victim C.Z. testified that in July 2018, she lived in a house on West Second Street, in what was known as the "Rockwood block." C.Z. was familiar with the Rockwood gang; her eldest son, who was incarcerated in 2018, had been a member. No one else in her family was affiliated with the gang. Because she had lived in the area her whole life, C.Z. was also familiar with Rockwood's rival gang, DIA; she testified that she saw members of both gangs cross out and paint over one another's graffiti tags. She was familiar with DIA member Ruiz, whom she knew as Pin, and had briefly spoken to him about two weeks prior to the incident. During that conversation, Ruiz told her "'Don't worry. Nothing's

---

[6] On cross-examination, the testifying officer conceded that he did not have photos of the dumpster indicating when the graffiti was placed there.

6

gonna happen to your house.'" C.Z. later identified Ruiz (as Pin) in a six-pack photo array.

C.Z.'s house was on a corner lot, on top of a hill. The house was surrounded by a wrought-iron fence only a few feet away from its outside walls. Victim M.L. described the small fenced area surrounding the house as "closed," with "nowhere to go."

The front door of the house faced West Second Street, and the side door faced an alley. A flight of approximately 20 cement stairs built into the side of the hill led from the alley to the gate in the fence. A few feet behind the gate, a smaller flight of stairs led to the front door of the home ("front stairs"). A second set of stairs on the side of the house ("side stairs") led to the side door.

### 3.    The Shooting

C.Z. hosted a barbecue for family and friends at her home on the evening of July 4, 2018. No one at the barbecue was an active Rockwood member. Shortly after midnight on July 5, 2018, C.Z. and several of her guests were inside the fenced area outside the house. C.Z. and her son, James Salinas, were standing near the side stairs talking to Salinas's pregnant girlfriend, Abril Onofre, who was on the side stairs. C.Z.'s minor son J.S. was in an area behind the side stairs with guests Ruben Alcantara and R.M. M.L. and her six-year-old daughter were on the front stairs.

C.Z. testified that she heard what she thought were "big fireworks"; she realized they were gunshots when she and Salinas "f[e]ll to the floor." The shots came from the top of the cement stairs, outside the fence. C.Z. suffered five gunshot wounds: two to her legs, two to her pelvis, and one to her face. As C.Z. drifted in and out of consciousness, she heard people calling

7

for her to wake up. The people also called out for Salinas and Onofre, but neither of them responded.

M.L. testified that she and her daughter attended C.Z.'s July 4, 2018 barbecue. M.L. testified that her daughter's father, C.Z.'s incarcerated son, had belonged to Rockwood; M.L. was familiar with the gang and its rival DIA. M.L. saw graffiti "cross-outs" from Rockwood and DIA "all the time" near C.Z.'s house, and testified that C.Z.'s home was less than a block away from "DIA alley." Before the shooting started, M.L. was near the side stairs, talking to C.Z., Salinas, and Onofre; other people, including R.M., were behind those stairs "in the back." M.L. went inside the house, and someone told her, "Pin is in the back." M.L. knew Pin to be a DIA member and had previously seen him tagging in the neighborhood. M.L. brought her daughter inside the house.

Sometime between 12:05 and 12:15 a.m., as M.L. was about to exit the front door onto the front stairs, she saw "someone shooting, like pointing the gun towards where [Onofre] was at, where [Salinas] was at, and where [C.Z.] was at." The shooter was firing from the top of the cement stairs, immediately outside the fence. M.L. realized that Salinas "had nowhere to go" and saw him fall as he tried to escape. The shooter then pointed the gun away from the side stairs and toward the front stairs, and began shooting at M.L. M.L. saw "a lot of bullets coming toward her" and tried to shield her daughter. M.L.'s daughter was not hit, but M.L. was struck in her left leg.

Although M.L. only saw one shooter, she testified that there were "a bunch of lights" and "a lot" of flashes, and it sounded like multiple guns were being fired. She estimated the shooting lasted about "a minute or so." M.L. "dragged" herself

8

and her daughter into the living room where her phone was charging, so she could call 911. Before she reached the phone, R.M. came inside and asked her for the address, because he was already on the phone with 911. The fire department arrived about five minutes later and transported M.L. to the hospital.

R.M., a member of the military, testified that he was at C.Z.'s barbecue. At the time of the shooting, he was standing inside the fence, in what he described "the little back area" near the side stairs. R.M. testified that he saw "flashes" and heard "bangs." He initially thought they were fireworks, but quickly "realized that people were running, and that's when I started running." As he heard "multiple . . . booms going off," R.M. ran further back into the fenced-in area, turned left, and hid in an area behind the rear of the house. As he was running, he felt liquid running down his backside and realized he had been shot in his lower back. R.M. estimated the shooting lasted "no more than 15 seconds." When it stopped, he ran to the front of the house, went inside, and called 911. He saw M.L. lying on the floor and asked her for the address.

Surveillance video showed three people walking toward C.Z.'s house at 12:21 a.m. and running away from it approximately one minute later. They got into a white car that had its headlights off and left the scene.

### 4. Initial Police Response and Appellant's Injuries

Los Angeles Police Department (LAPD) officer Ramon Ramirez arrived on the scene around 12:30 a.m. on July 5, 2018. Ramirez saw Salinas lying on the ground near the side stairs. Salinas was unconscious and not breathing, and Ramirez observed gunshots to his chin and right leg. C.Z. was lying next to him, also unconscious. Onofre was on the side stairs, with

gunshot wounds to her head and stomach. J.S., who "appeared in shock" and "was a bit hysterical," led Ramirez to the area behind the side stairs, where Alcantara was lying with gunshot wounds to his legs and ribs. J.S. told Ramirez he had heard his brother, Salinas, say there was "a gold car running around" before the shooting began. J.S. then saw two Hispanic males come up from the alley, say "fuck you," and start shooting "everywhere." J.S. estimated they shot "more than twenty" times. A third person remained in the gold car. Footage from Ramirez's body-worn camera was played for the jury and admitted into evidence.

Then-LAPD officer Kevin Kroneberger responded to the scene and was directed to travel to L.A. County/USC Medical Center with one of the female victims. While medical personnel were treating her, Kroneberger saw a male gunshot victim arrive; Kroneberger had not seen him at the scene and did not recognize him. Kroneberger talked to that person, who identified himself as Art Tobias. Appellant told Kroneberger he "got shot in the arm three times" by a homeless Black man while waiting at a bus stop. Appellant then flagged down a "Honda Civic type of car," and "some old guy" drove him to the hospital and dropped him off.

Kroneberger told appellant that officers in the relevant precinct would investigate the incident. LAPD detective Ray Martinez subsequently went to the hospital to get more information from appellant but was unsuccessful. The first time, appellant was medicated and sleeping; the second time, Martinez was unable to locate appellant because he had left the hospital. Later investigation revealed that no shootings had been reported in the area around the time appellant claimed he was shot.

10

M.L. also spoke with a police officer about the shooting at the hospital. She described the shooter she saw as a "Hispanic male, darker complexion, about six feet tall." At trial, she testified that she did not remember telling the officer precisely how tall the shooter was, only that he "seemed tall" because "when you're at the stairs, all you see is going down." She also clarified that she told the officer the shooter was "heavy" because she "didn't know how to say, like, just not fat but . . . not skinny."

Several months after the shooting, M.L. selected a photo of appellant from a six-pack photo array as a person who "looks like the shooter"; she cited his "face expressions" and "tattoos around his – his face." An officer agreed at trial that M.L. "had given a quite different description of the shooter . . . close to the time of the incident." M.L. identified Ruiz in a second six-pack. She admitted on cross-examination that she initially told police Ruiz was the shooter, but explained that she "thought it was that person because that's the person that I would see most of the time there."

### 5. Diablos' Post-Shooting Actions

Shim testified that about an hour and a half after he went to sleep in his car at Vasquez's parents' house, Jonathan woke him up by knocking on the window and telling him Vasquez had been shot. Shim "quickly sobered up" and drove himself and Jonathan to the crime scene. When they arrived, the area was "taped off with yellow tape," and "news trucks and police officers" were present. Shim asked one of the officers what had happened, and they told him to leave. He went back to the car, and Jonathan, who was on the phone, directed him to a hospital in Long Beach about 25 or 30 minutes away. Fajardo and Alfonso were also waiting at the hospital. Shim saw Vasquez in the lobby

11

once he was released; Vasquez's forearm and hand were "swollen" and "wrapped up a little bit." They all left the hospital and went to the house Vasquez and Alfonso shared, where Vasquez "put the guns away" in a safe.

Vasquez told Shim various things about the shooting while they were at his house. He said, "Casper [appellant] shot me on accident," and "Shy Boy [Fajardo] shot Casper" three times during the incident "on 2nd." Vasquez also told Shim he had said "Fuck Cockwood" before he began shooting at a group of people lighting fireworks. Vasquez told Shim they "dropped off Casper [appellant] at a different hospital," and told appellant to say he had been shot by Black people at a bus stop. Vasquez said they had used his Glock 22, appellant's "Keltec .32," and a Glock 19 during the shooting. Fajardo told Shim that appellant had gotten in front of him while he was shooting.

Cellphone data showed that Vasquez's and Jonathan's cell phones were near L.A. County/USC Medical Center between 12:28 and 12:36 a.m., and surveillance footage showed a white sedan approach the hospital at 12:32 a.m. Vasquez's phone was near Long Beach Hospital at 2:23 a.m., and Alfonso's phone was there between 2:10 and 3:00 a.m. Jonathan's and Shim's phones were also near Long Beach Hospital between 3:00 and 4:00 a.m. Jonathan's phone was near the crime scene at 2:40 a.m. and called phones belonging to Ruiz and Alfonso around that time.

### 6. Subsequent Investigation

Investigators recovered 19 .40-caliber cartridge casings, 20 nine-millimeter cartridge casings, and several fired bullets of unknown caliber from the crime scene. The nine-millimeter casings were all fired from the same gun and were mostly clustered near the top left of the cement stairs; the .40-caliber

12

casings were all fired from the same gun and were mostly clustered toward the middle of the cement stairs. The fence around the house was "bullet-ridden," and there were about six bullet holes in the side of the house.

Deputy medical examiners testified that four victims were killed during the shooting. Salinas suffered eight gunshot wounds, all of which traveled left-to-right through his body. Two of the wounds, to his forehead and chin, were fatal. Alcantara sustained six gunshot wounds, including two fatal wounds that perforated his intestines and pancreas. Onofre, who was 19 weeks pregnant at the time of the shooting, had four gunshot wounds and multiple "shrapnel-type wounds." Two of the gunshots, one to her head and one through her torso, were fatal. Onofre's otherwise "fine" and "unremarkable" fetus, Jay Salinas Onofre, "died in utero because the mother passed away." The medical examiners opined that all four deaths were homicides.

### C. October 7, 2018 Incident

The People presented evidence that Shim, Vasquez, and Fajardo participated in the fatal shooting of Rockwood member Jerry Ramos on October 7, 2018. There was no evidence that appellant was involved in this incident. There was, however, evidence that the gun used in the Ramos shooting was also used in the July 5, 2018 shooting. That gun was later recovered during the August 2019 arrest of someone unrelated to this case.

### D. Apprehension and *Perkins* Statements

A few weeks after the Ramos shooting, police installed a pole camera outside Vasquez's parents' house. It eventually captured the license plate numbers of Vasquez's, Jonathan's, Shim's, and Ruiz's cars. Using surveillance video, police connected the cars to the Ramos shooting. Police obtained arrest

13

warrants for appellant, Vasquez, Jonathan, Ruiz, and Shim in late January 2019, and arrested Vasquez shortly thereafter.

On February 8, 2019, police executed a search warrant at an apartment linked to appellant. They recovered an "electronic device" with graffiti reading "Faketeen K" painted on it. An officer testified that the graffiti was similar to the tattoo appellant had on his face, and that K "stands for 'killer.'" Other graffiti on the device included DIA; "WS," meaning "West Side"; and "X3," meaning 13. Police recovered several other graffitied items. The graffiti included DIA; appellant's nickname, Casper; and the letters "RWK," which an officer testified meant "Rockwood Killer." Police also recovered "numerous nine-millimeter rounds" and luggage with appellant's name on it.

Shim testified that in early February 2019, Vasquez told him to leave the state. Shim drove his red Acura to Las Vegas and took appellant and Fajardo with him. After four or five days, Shim drove appellant to a bus stop; appellant told Shim he was going to Nebraska. Shim and Fajardo stayed in Las Vegas. Shim was arrested there on February 25, 2019, after police located and impounded his car. When Shim was arrested, he falsely told police that appellant committed the Ramos shooting because he "didn't want to give . . . up" his roommate Fajardo.

Police eventually located and arrested Fajardo and appellant. During a May 6, 2021 *Perkins* operation, the entirety of which was video recorded and played for the jury, Fajardo identified himself as Shy Boy from DIA. He told the agent he had participated in the July 5, 2018 shooting with Chucky (Vasquez) and Casper (appellant), who had horns tattooed on his head. During the shooting, they "ran up" to the house and targeted Rockwood members. Fajardo denied seeing a pregnant woman at

14

the house and said, "I only seen two fools – two fools. And I'm the one that got the two." When the agent asked what Chucky and Casper did, Fajardo responded, "I don't know. I was just focused on what I was doing, fool." However, Fajardo also responded "yeah" when the agent asked if appellant shot, and indicated a belief that appellant had been "snitching" on the others. Fajardo said appellant was "a straight bitch" who was "no good," and Fajardo was going to kill him.

Appellant was also the subject of a separate *Perkins* operation that was video recorded and played for the jury. During the operation, discussed in greater detail below, appellant made various inculpatory statements about the July 5, 2018 shooting. After an officer mentioned there were two shooters, appellant said he was "full of shit" and gestured to the agent that there were three shooters. Appellant also told the agent that they were all armed; that he was shot four times by "friendly fire," "crossfire" during the incident; and that he "skipped surgery" at the hospital because police were trying to talk to him. After a detective let the agent see a photograph of appellant at the hospital, appellant told the agent he had gotten his "Faketeen" face tattoo removed and grown out his hair to cover the devil horns.

## II. Defense Evidence

Appellant called LAPD sergeant Meghan Santos. She testified that she interviewed M.L. at the L.A. County/USC Medical Center on July 5, 2018. M.L. told her that it had been difficult to see the shooter because it was dark, but described him as "taller, slightly heavyset, and darker complected." She was not able to see any tattoos.

15

Vasquez called Shim's ex-girlfriend, Min Ji Kim, as a witness. She testified that she dated Shim for a few months in 2018, and he "had a really weird relationship with the truth." She further testified that he was not known for his honesty or integrity and did not have a reputation for truthfulness.

## DISCUSSION

### I.     Admission of *Perkins* Evidence

Appellant argues that the court erred by admitting evidence from the *Perkins* operation involving appellant because the coercive nature of the operation rendered his statements involuntary. We disagree.

#### A.     Additional Background

##### 1.     The Operation

The *Perkins* operation involving appellant began shortly after 8:00 a.m. and lasted approximately 5.5 hours. During the operation, appellant, then 22 years old, was in a jail cell with an agent who said he was 48 years old and had been arrested for murder. Appellant and the agent began chatting immediately. Less than ten minutes into the conversation, appellant told the agent that the officers "think we're stupid," "put us in this room to…mind fuck us," "want us to talk," and were "probably listening to us right there." The agent responded, "this is nothing right here," "it's the cells . . . we gotta worry about."

After about 20 minutes, Detective Romero entered the cell and said he was investigating "a shooting that happened on 4th of July weekend 2018, when three people got killed." Appellant said, "I'm not trying to talk to you guys," and Romero left within 30 seconds. Appellant then asked the agent about a photograph Romero had been holding. The agent said it showed "a bald-headed fool with a tattoo on his face," with "a nurse or something

16

standing right next to him," and it looked like Romero had been "trying to compare him to you." Appellant explained that he had some tattoos removed, because they made him "a target," particularly the "Fuck a fake teen" tattoo on his face. The agent said the removal "looks good," and would make it more difficult for the police to "prove that was actually you." Appellant later said, "I'm not talking to them, fool. I told them. I was, like, 'Does my lawyer know you're taking me in yet?'"

Appellant subsequently asked the agent, "You think I have hope, fool?" He responded, "it depends . . . because you don't know what they'll have yet." Appellant replied, "I mean, but that's the way you're supposed to do it, no? You're not supposed to talk to them." The agent said that he personally would "hear them out" to see what evidence they had. After more conversation about appellant's tattoo removal and time in Nebraska, appellant emphasized that he had been back in town for "almost two years already" without being arrested. The agent said "somebody might have said something," or else the police were "just bullshitting with you." Appellant agreed that the police were probably trying to mess with him.

After the agent asked appellant what neighborhood he was from, appellant responded that he was from DIA. He added that he had left the gang and had been "doing my own thing." When the agent asked for more details about DIA's enemies, appellant responded, "I'm low key not really trying to talk about it, fool." Appellant later told the agent he had "cut all ties" with the gang, "like scissors, fool, for real."

About one hour and 13 minutes into the operation, Detective Romero came by and told appellant it was going to be awhile because police were conducting "a very serious

investigation" of a 2018 incident in which three people were killed and three others were injured. Romero added that they had "already picked up Pen [*sic*], the Forest, Chucky, and last week we picked up Shy Boy"; appellant was "the last guy we got." Romero then left, within a minute of his arrival.

Appellant said his "gut" was "telling" him that someone snitched on him, likely "the last one" picked up before him. The agent suggested it had taken the police "all this fucken time to actually find something solid" against appellant. Appellant said he had been arrested with a gun, but the ballistics would not match the gun used in the shooting. After some back and forth, appellant said the police "honestly could just be saying that shit. . . . They be throwing names out there." He wondered if they "got a face to those names," and the agent asked if appellant had heard if any of them had been "busted." There was no audible response, but the agent then replied, "See? They're not lying." The agent suggested that appellant could infer from Romero's remarks whether the police were lying or not "doing [their] homework right." Appellant responded, "I'm telling you right now they didn't do their homework yet, fool," but did not say more.

Detective Romero entered the cell a third time approximately 30 minutes later, to photograph injuries appellant sustained during the shooting. Appellant told Romero to "Put them on the internet. Sell them. You'll make some money." Appellant also asked Romero to call his lawyer.

After Romero left, the agent asked appellant where he got shot. Appellant said he got shot "like, four" times, including a graze wound. He added that he had "skipped surgery" for the wounds, "because they were trying to talk to me at the hospital."

18

The agent said appellant "must've leaked" blood somewhere. Appellant dismissed this theory: "Dick, if I was bleeding all over the fucken place, they would've been got me, fool [*sic*]." A few minutes later, appellant asked the agent, "What do you think I should do, fool? A speedy trial? Get it out the way or fucken fight this? What do you think?" The agent responded with questions about how quickly appellant went to the hospital and whether the police had the guns from the incident. Appellant said it took "[b]etween 20 and 30" minutes to get to the hospital, and that the police "don't got no toy, fool."

The agent said that if appellant went to trial, it would be the snitch's word against his. He added that appellant could take a plea bargain, but even that would result in "a long stretch" of incarceration. Appellant agreed and said he was "trying to get, like, voluntary"; he mentioned an example of someone who had negotiated such a plea, and said he had retained the same attorney. The agent said that appellant had to "figure something out," and appellant responded, twice, "I'm as fucked as a bitch that's bent over right now, fool."

Detective Romero returned to the cell and took appellant elsewhere for approximately eight minutes. When they returned, Romero told appellant the case was "serious" and mentioned its location "in Rockwood area." Romero added, "Three guys walk up there. They – only two of them shot, and – you got shot is [*sic*] in the shoulder, so I gotta figure out exactly who the shooters are." Romero reiterated that "everybody" had already been arrested, and "all the facts are there," including appellant's blood at the crime scene. Romero told appellant to talk to his lawyer and "[f]igure out what's best for you." Appellant responded, "I'd

appreciate it if you didn't talk to me without my lawyer present from now on."

Once Romero left, appellant told the agent Romero was "full of shit" about him leaving blood at the crime scene, and was "just not trying to tell me . . . that somebody was talking. That's what it is." The agent agreed and said Romero wanted to know what role appellant had played. Appellant responded, "That ain't my cup of tea, fool," and added, "I think that fool is just fishing." Appellant continued, "I was like, fuck. I hope I'm not going to have to be in here by myself right now, fucken, with all these thoughts." The agent said, "I'm not going nowhere." Appellant reiterated that Romero was 'full of shit," but gave no audible response when the agent asked for clarification. Appellant later added, "He needs to try harder, dog, because I been through this shit before. I'm not falling for that shit, not at all."

Romero later returned a fifth time, approximately three and half hours after the operation started. He collected a DNA sample from appellant and mentioned that appellant was actually "being arrested for four" murders, not three, because "[o]ne of the people that was killed was a pregnant girl, six months pregnant, so that counts for two murders, her and her baby." As soon as Romero left, the agent said, "that's not going to be good, homie," because it was "a no-no" to kill a pregnant woman. The agent added that he, the agent, "could be in trouble, too," by virtue of association with appellant. Appellant responded, "They can charge me with that shit but doesn't mean that I did it. It doesn't mean that they're all right. They gotta prove that shit. They can't just charge everybody for the same body." The agent disagreed, saying, "you guys are all over there, so that's you guys' responsibility." The agent said he "need[ed] to

clear it up, because I don't want to be the one stuck in a wreck later on." Appellant acknowledged he was "gonna get a beating." When the agent asked if the pregnant victim was "supposed to get hit," appellant gave no audible response, but the agent said, "you're saying no."

Appellant subsequently called Romero a "[f]ucken bitch ass fool" for slamming the cell door loudly when he mentioned the pregnant victim, and the agent agreed that "he threw that out there on purpose." The agent and appellant were eating lunch as they talked. The agent said the food was "nasty," and "I thought we were going to get a sandwich." Appellant responded, "This shit make me not want to eat now." The agent replied, "Yeah, some nasty stuff." Appellant said, "Dog meat, man."

The agent then asked appellant if he had known a pregnant victim had been killed. Appellant did not audibly respond, but the agent replied, "Oh, you knew already? I thought you said – I honestly thought you didn't know." Appellant replied, "Just I didn't know he was – it would count as four." Appellant mentioned he was "fucken paranoid like a motherfucker, fool," even though "all they have right now is that I was there, and I got shot."

About four and a half hours into the operation, an officer took the agent away to get "printed" and "processed." The agent returned approximately 30 minutes later and told appellant that Detective Romero was "up there with some fucken fool trippin' right now," a "Chinese guy" who was "crying like a motherfucker." Appellant asked what the guy looked like, because he wanted "to know if it's one of my homies." The agent provided some vague descriptors, and he and appellant appeared to conclude the guy was there for something else. Appellant said

he was "already thinking, like . . . who I'm going to have be sending me money, all kinds of crazy shit." Detective Romero subsequently came to the cell and mentioned "the pregnant lady with the baby" again. He also said that police knew someone else in custody had shot appellant. Appellant said, "I need to go to therapy after this shit, fool. That fool keeps emphasizing that shit. Like, for what, fool?" The agent asked, "For what? The baby and the --?" Appellant said, "Yeah," and suggested that Detective Romero was trying to get the agent to "fucken act out."

The agent asked appellant why Romero had said appellant's homie shot him, and whether there was a "green light" on appellant. Appellant said, "No, no, no, no, no, no, no," and swore "on the gang" that he had been injured by "crossfire, fool, friendly fire." Appellant accepted the agent's apology for asking so many questions about appellant's "homie" shooting him, but also said, "reality is smacking me in the face right now, fool."

Appellant told the agent to look at him, made an inaudible gesture, and asked, "You get me or no?" The agent said no, and appellant responded, "It's just so many, so many of us." When the agent asked how many, appellant said, "All of us hopped out." He also said that "[a]ll of us" "had straps," or guns. Appellant denied he shot the pregnant victim, and expressed disbelief that one of his compatriots had admitted to shooting him. Appellant made no audible response to the agent's multiple inquiries as to whether he and the others had faced internal gang retribution for the incident. Appellant reiterated that the gun they found on him was not connected to the crime, and also said he cleaned "everything" and had worn two pairs of gloves and a hoodie. The agent told appellant, "I got your back, homie," and said he had "a

22

lot of pull . . . with a lot of the homies." The agent subsequently asked if the shooting had been a drive-by. Appellant denied that, telling the agent, "That shit's not allowed, fool," and "We parked and hopped out."

The agent told appellant that everyone appellant ran into in county jail would ask "the stupid questions I'm asking." Appellant said that "a fool from that neighborhood," Rockwood Street, would be likely to press the issue, and that appellant "might as well just go up to him and just knock it out right then and there, fool." As the conversation concluded, appellant reminded the agent that he had made it three years without being arrested. Appellant added, "There's no way you could last three years, fool." When an officer came to the cell to remove appellant, the agent told him, "Take care of yourself, man." Appellant responded, "Yeah. Good luck to you, dog."

### 2. Motion to Suppress

Prior to trial, appellant filed a motion to suppress the *Perkins* operation. Appellant argued that the case was "virtually exactly analogous" to *Arizona v. Fulminante* (1991) 499 U.S. 279 (*Fulminante*), in which the Supreme Court found a confession coerced and inadmissible where a jail informant elicited a confession in exchange for protection. Appellant argued that the instant case was "more egregious," because Romero and the agent were "working in Tandem [*sic*]" to use "several psychological ploys intended to increase Tobias' fear." The People opposed the motion. They argued that *Fulminante* was distinguishable on several grounds, and there was an "overall lack of coercion" in the operation.

The trial court heard the motion on October 19, 2023. Appellant argued that the People's "attempts to differentiate"

23

*Fulminante* were "misleading," and argued that the case was controlling. He contended that Detective Romero and the agent were "using the truth to intimidate him" by emphasizing the death of the pregnant victim and the injuries appellant sustained during the incident. He further argued that appellant had to confess "in order to relieve him of the pressure of either immediate assault right there . . . or later assault when they get to the county jail," and only did so several hours into the operation, after Romero came by multiple times. The People rebutted these contentions, and appellant briefly replied.

The court denied the motion. It explained that it had watched the entire video of the operation, and, contrary to appellant's suggestion that he had been "constantly badgered," saw "two guys sitting in the cell" having a conversation with long pauses. The court noted that appellant had indicated he was "a pretty well-versed guy," and "his body language didn't show any sense that he was afraid or that he was intimidated or that he felt uncomfortable. Literally, he was sitting back most of the time and just talking with the informant." The court observed that appellant and the informant were "just going back and forth, back and forth, talking this, talking that," with "some levity here and there." The court stated that it looked at "the totality of the circumstances," including "what was said during the conversation, how it was said . . ., and any other factors to see if there's any hint of coercion." It concluded that the operation was "factually dissimilar" from *Fulminante*, and "I don't see anything that warrants the court to make a determination that this was a coerced statement that would prompt the court to suppress it."

A video of the entire operation was admitted into evidence and played for the jury during trial.

24

**B.   Legal Standards**

The due process clauses of the federal and state constitutions prohibit the People from introducing a defendant's involuntary statements at trial. (*People v. Boyette* (2002) 29 Cal.4th 381, 411; *People v. Weaver* (2001) 26 Cal.4th 876, 920.) A statement is considered involuntary if it is not the product of a rational intellect and free will. (*People v. McWhorter* (2009) 47 Cal.4th 318, 346.) "The test for determining whether a confession is voluntary is whether the defendant's 'will was overborne at the time he confessed.'" (*Id.* at pp. 346-347.) To determine whether a defendant's will was overborne, the trial court considers the totality of the circumstances surrounding his or her statements, including the characteristics of the defendant and the details of the interrogation. (*Id.* at p. 347.)

Coercive police activity may be a prerequisite to a finding that a confession was involuntary. (*People v. McWhorter*, *supra*, 47 Cal.4th at p. 347.) Such activity includes threats of violence, the exertion of improper influence, or direct or implied promises. (*Ibid.*) However, coercion is determined from the perspective of the defendant, and "'[t]he essential ingredients of a "police-dominated atmosphere" and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate.'" (*People v. Fayed* (2020) 9 Cal.5th 147, 165, quoting *Perkins*, *supra*, 496 U.S. at p. 296.) Moreover, coercive police activity alone is not sufficient to establish that a confession or statement is involuntary. (*People v. McWhorter*, *supra*, 47 Cal.4th at p. 347.) "The statement and the inducement must be causally linked." (*Ibid.*) Accordingly, "'[t]he use of deceptive statements during an investigation does not invalidate a confession as involuntary unless the deception is the type likely

to procure an untrue statement.'" (*People v. Fayed*, *supra*, 9 Cal.5th at p. 165.)

At trial, the People bear the burden of demonstrating voluntariness by a preponderance of the evidence. (*People v. McWhorter*, *supra*, 47 Cal.4th at p. 346.) When a statement is video recorded, and the facts surrounding the making of that statement are undisputed, we review the trial court's determination of voluntariness de novo. (*Ibid.*)

### C. Analysis

Appellant contends the totality of the circumstances surrounding the *Perkins* operation "reflect a pattern of conduct by Detective Romero and the [agent] amounting to psychological coercion that resulted in appellant making incriminating statements because his will was overborne." He asserts that he initially invoked his right to counsel and did not respond to the agent's attempts to elicit incriminating statements. However, as time passed, and Romero "provided incremental bits of information," the agent used that information "in a manner intended to increase anxiety and stress in appellant in order to elicit incriminating statements" from him. Pointing in particular to the period after Romero's fifth visit to the cell, appellant asserts that he "made references to the stress these events had placed upon him," including "losing his appetite, feeling paranoid, that the reality of the situation was smacking him in the face, and that he felt in the [*sic*] need for therapy." Only then, and only after the agent said he had "a lot of pull" and had appellant's back, did appellant "beg[i]n to answer" the agent's questions.

The record does not support the conclusion that appellant's will was overborne or that his statements to the *Perkins* agent were involuntary. Although the agent was "much more than a

26

passive listener," nothing about his questions or tactics was improper or suggested a likelihood of procuring an untrue statement. (*People v. Fayed*, *supra*, 9 Cal.5th at p. 166.) As the trial court observed, appellant and the agent had an ongoing friendly conversation. There were no hallmarks of coercion or indicia of appellant caving to pressure. To the contrary, appellant declined to answer the agent's questions at various points, and the conversation simply moved on. For instance, the agent did not press appellant when he declined to discuss DIA's enemies early in the conversation. Much later, appellant refused to answer the agent's queries about whether he and the others had been disciplined by gang elders for the shooting. Appellant also told the agent it was not his "cup of tea" to discuss his role in the shooting, and did not explain why he believed Detective Romero did not "do [his] homework" and was otherwise "full of shit" about certain aspects of the investigation.

At other points, appellant actively pushed back against the agent's inquiries and theories, even though the agent was twice his age and had an allegedly severe criminal history. Appellant dismissed the agent's repeated suggestions that appellant "leaked" blood at the crime scene, called the agent a "dick," and expressed doubt that the agent could "last three years" evading capture as appellant had. Appellant also demonstrated savviness regarding the legal process and his rights to counsel and against self-incrimination, and repeatedly refused to cooperate with Detective Romero. There is no indication that his will was overborne or that his mental state deteriorated as a result of the agent's conduct. Appellant made the comment about not wanting to eat in the context of a discussion of the lunch being "dog meat," and the comment about needing therapy in response to Romero's

27

repeated mentioning of the pregnant victim. Appellant also recognized, however, that Romero was purposefully emphasizing the pregnant victim, telling the agent that Romero was trying to get the agent to "fucken act out."

Despite appellant's attempt to analogize this case to *Fulminante, supra*, 499 U.S. 279, we find *Fulminante* distinguishable. In *Fulminante*, the defendant was a suspect in the murder and possible sexual assault of his minor stepdaughter. No charges were filed against him, however. (See *Fulminante, supra*, 499 U.S. at p. 282.) The defendant subsequently was incarcerated for illegal firearm possession, and rumors circulated that he was suspected of killing a child. (See *id.* at pp. 282-283.) An agent told the defendant that he had heard the rumors and knew the defendant was "'starting to get some tough treatment and whatnot'" as a result. The agent offered to protect the defendant from the other inmates, but only if the defendant told him about the crimes. (*Id.* at p. 283.) The defendant then confessed to sexually assaulting and killing his stepdaughter. (*Ibid.*) The prosecution introduced the confession against him at trial for the crimes, but the state Supreme Court ultimately concluded that was error because the confession was coerced. (See *id.* at p. 284.) The U.S. Supreme Court affirmed the finding that "it was fear of physical violence, absent protection from his friend (and Government agent) [ ], which motivated Fulminante to confess." (*Id.* at p. 288.) The Court explained that because there was "a credible threat of physical violence," the defendant's "will was overborne in such a way as to render his confession the product of coercion." (*Ibid.*)

Here, the agent did not threaten appellant with violence, either at his own hand or the hands of others. His statement

that he had appellant's back was vague and nonspecific, not a quid pro quo offering of protection in exchange for information. Appellant recognized that he would probably be beaten because a pregnant victim had been killed, but also indicated a willingness to stand up for himself, particularly against any Rockwood members who might confront him in the future.

This case is also distinguishable from *People v. Jimenez* (2021) 73 Cal.App.5th 862 (*Jimenez*) to which appellant analogizes it here. In *Jimenez*, the detective "made an explicit threat to charge defendant's sons with homicide unless defendant confessed," and the defendant "said nothing to implicate himself in a crime until after" that threat was made. (*Id.* at pp. 877-878.) Neither the agent nor Detective Romero made any threats against appellant or anyone connected with him, even after appellant mentioned his mother and his positive relationship with her. Appellant argues that the operation here equivalently "played on defendant's emotions" (*id.* at p. 877) by virtue of "the slow, relentless, incremental presentation of evidence, like water dripping on stone, adverse to appellant." Even if the record supported such an inference, there is no indication that appellant's will was overborne as a result. He revealed information sporadically throughout the entire course of the conversation, not in response to any particularly coercive or threatening behavior by the agent and not, as appellant suggests, only after the agent said he had "a lot of pull." Appellant also asserted himself throughout the operation, pushing back against both the agent and Romero. In short, the totality of the circumstances do not support a finding of coercion.

Even more unsupported, and inappropriate, is appellant's assertion that, "although the trial court stated its review and

ruling were based on consideration of the totality of the circumstances, the court's expressed findings do not reflect such review." The court expressly stated twice, at the beginning of the hearing and before ruling, that it had reviewed the entirety of the relevant materials. Nothing in the record lends any credence to appellant's contrary assertion, which appears to be predicated solely on the court's failure to mention specific statements appellant made during the lengthy operation—statements appellant also neglected to mention in his motion and at the hearing.

"Disparaging the trial judge is a tactic that is not taken lightly by a reviewing court." (*In re S.C.* (2006) 138 Cal.App.4th 396, 422.) It is not well-taken here. There is no basis from which to conclude the trial court did not properly review the *Perkins* operation. To the contrary, its discussion of what appellant dismisses as "demeanor evidence" evinces careful attention to the totality of the circumstances surrounding the operation.

## II.     Sufficiency of Evidence Supporting Enhancements

Appellant contends that the jury's true findings on allegations that he personally used a firearm during the July 5, 2018 incident (§ 12022.5, subd. (a)) were not supported by substantial evidence. We reject this contention.

### A.     Legal Standards

"The standard of appellate review for determining the sufficiency of the evidence is settled. "'On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]'" (*People v. Wilson* (2008)

30

44 Cal.4th 758, 806.) "'Whether a defendant used a firearm in the commission of an enumerated offense is for the trier of fact to decide.'" (*Ibid.*) "We review the sufficiency of the evidence to support an enhancement using the same standard we apply to a conviction." (*Ibid.*) Accordingly, we presume every fact in support of the enhancement that the trier of fact reasonably could have inferred from the evidence. (*Ibid.*)

Section 12022.5, subdivision (a) provides an enhanced sentence for "any person who personally uses a firearm in the commission of a felony or attempted felony." "Proof of firearm use during a felony does not require a showing the defendant ever fired a weapon." (*People v. Wilson*, *supra*, 44 Cal.4th at p. 806.) "Thus when a defendant deliberately shows a gun, or otherwise makes its presence known, and there is no evidence to suggest any purpose other than intimidating the victim (or others) so as to successfully complete the underlying offense, the jury is entitled to find a facilitative use rather than an incidental or inadvertent exposure." (*People v. Granado* (1996) 49 Cal.App.4th 317, 325.)

**B.    Analysis**

The primary evidence that appellant personally used a firearm was victim M.L.'s identification of appellant as the shooter and express testimony that she saw flashes coming out of the gun he held. Appellant contends that M.L.'s testimony was "so fraught with inconsistencies that it fails to provide the reliable, credible, evidence of solid value necessary to support the enhancement."

"In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) "Resolution of

conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact." (*Ibid.*) Unless a witness's testimony is "physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction."

No physical impossibility or inherent improbability appears in M.L.'s identification of appellant as the shooter. She testified that she selected his photograph from a six-pack photo array based on his "face expressions" and facial tattoos. At the time of the incident, appellant had distinctive facial tattoos, including the "devil horns" M.L. described on the stand. Appellant points out various inconsistencies in M.L.'s descriptions of the shooter, including his height and build, and his witness's testimony that M.L. said she did not see any tattoos. M.L. offered explanations for her inconsistent descriptions of the shooter, and the jury was entitled to resolve these inconsistencies against appellant. We do not revisit its determination.

In any event, other evidence corroborated M.L.'s testimony that appellant used a gun during the incident. Appellant directly told the *Perkins* agent that "all of us hopped out" of the car to commit the shooting and "[a]ll of us" "had straps," and gestured that there were three shooters. In a separate *Perkins* operation, Fajardo indicated to the agent that appellant fired. Shim testified that Vasquez said three guns were used during the incident, including one belonging to appellant, and appellant shot Vasquez during the incident. Appellant contends that Shim's testimony is unworthy of credence, and that Vasquez's and Fajardo's statements were hearsay. Again, the weight to afford the evidence was a question for the jury.

Appellant also points to physical evidence suggesting that only two guns were used, and to the People's closing argument

32

that Vasquez and Fajardo "were the shooters in this case."  He asserts there is "no coherence to these various recountings" and M.L.'s testimony, such that the enhancement findings cannot be supported.  "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)  Here, the People's hypothesis, argued at trial, was that appellant fired at least once before his gun jammed, or that his weapon left behind no casings.  These are valid hypotheses consistent with M.L.'s testimony that she saw flashes coming from appellant's gun, and also with the bullets of unknown caliber recovered from the crime scene.  It was also possible, as the People point out, that appellant used one of the guns from which multiple casings were recovered; the police found "numerous nine-millimeter rounds" when they searched his home.

Sufficient evidence supports the jury's enhancement findings.

## III.  Fines and Fees

The trial court imposed a $10,000 restitution fine (§ 1202.4, subd. (b)), imposed and stayed a $10,000 parole revocation fine (§ 1202.45, subd. (a)), and assessed a $40 court security fee (§ 1465.8, subd. (a)(1)) and $30 court construction surcharge (Gov. Code, § 70373, subd. (a)(1) for each count.  Appellant contends these fines and fees violated his rights to due process and equal protection because the trial court did not consider his ability to pay before imposing them.

Appellant did not challenge the imposition of any of the fines or fees on any basis in the trial court.  He accordingly has forfeited any appellate argument regarding his ability to pay.

33

(*People v. Wilson* (2023) 14 Cal.5th 839, 867.)  The Supreme Court recently held in *People v. Kopp* (2025) 19 Cal.5th 1, 30 (*Kopp*) that a trial court must "upon request, [ ] consider a defendant's inability to pay before imposing a court operations assessment under Penal Code section 1465.8, subdivision (a)(1) or a court facilities assessment under Government Code section 70373, subdivision (a)(1)."  No request was made here.

The restitution fine imposed under section 1202.4 is a punitive fine that must be imposed in every case unless the court finds and states on the record compelling reasons not to do so. (*Kopp*, *supra*, 19 Cal.5th at p. 13.)  The fine must be not less than $300 and not more than $10,000, and the trial court may consider a defendant's ability to pay when imposing a fine higher than the minimum amount.  (*Ibid.*, citing § 1202.4, subds. (b)(1), (c).)  By statute, the defendant bears the burden of demonstrating an inability to pay.  (§ 1202.4, subd. (d).)  Appellant made no effort to do so, and "we may assume the trial court was aware of and fulfilled its statutory duty to consider ability to pay when setting the restitution fine." (*People v. Wilson*, *supra*, 14 Cal.5th at p. 868.)  There is no due process requirement to hold an ability to pay hearing before imposing this punitive fine or its related parole revocation fine.  (*Kopp*, *supra*, 19 Cal.5th at p. 23.)  "The excessive fines analysis, which considers ability to pay, is the proper vehicle to challenge punitive fines" (*ibid.*), and appellant raises no argument concerning excessive fines here.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


ZUKIN, P. J.


TAMZARIAN, J.